UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TURBO GLOBAL PARTNERS, INC., and ROBERT W. SINGERMAN,<br><br>Defendants. | Civil Action Number<br><br><br>**Demand for Jury Trial** |

# COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission") alleges as follows.

## SUMMARY

1. This case involves two COVID-19 related fraudulent press releases issued on March 30 and April 3, 2020 by a penny stock company, Turbo Global Partners, Inc. ("TRBO"), and its chief executive officer and chairman, Robert W. Singerman, who was previously enjoined from violating the federal securities laws.

2. The press releases described a purported "strategic alliance" between TRBO and another company, BeMotion, Inc. ("BeMotion"). Those press releases represented that TRBO and BeMotion were actively selling equipment that scans large crowds to detect individuals with elevated fevers, and claimed that this unique technology could be instrumental in breaking "the chain of virus transmission through early identification of elevated fever, one of the key early signs of COVID-19." The press releases further claimed, among other things, that TRBO was the "intermediary in this private/public partnership," the product was available to be deployed immediately, and that TRBO could ship the product within five days of receiving an order. Those claims were false.

3. TRBO's press releases materially impacted both the trading volume and share price of TRBO securities. For example, the day after one of the press releases issued, the trading volume doubled and the intraday high for the share price jumped around 15%.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

5. This Court has jurisdiction over this action pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

6. In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails.

7. Venue is proper in this district as to all defendants. Defendant Singerman resides, and Defendant TRBO has its principle place of business, in this district.

## FACTS

A. **Defendants**

8. **Turbo Global Partners, Inc.** is a Nevada corporation with its principal place of business in Tampa, Florida. Neither TRBO nor its securities are registered with the Commission, and its common shares are quoted under the ticker "TRBO" on OTC Link (previously "Pink Sheets") operated by OTC Markets Group Inc. The Commission temporarily suspended trading in TRBO's securities from April 9, 2020 to April 23, 2020. TRBO purports to be a digital marketing company that places digital displays inside any business or location that attracts consumers, focused on pharmacies.

9. **Robert W. Singerman**, age 69, is the chief executive officer and chairman of TRBO and resides in Tampa, Florida. Singerman is a recidivist securities violator. The Commission previously charged Singerman with fraud in 1999 based on his fraudulent sale of securities through a network of boiler rooms, and a permanent injunction was entered against Singerman in connection with that conduct.

B. **Other Party**

10. **BeMotion, Inc.** is a privately-held technology company that, prior to March 2020, focused on digital marketing. The company has offices in Toronto, Canada and Amman, Jordon. In March 2020, BeMotion began pursuing the sale of thermal scanning devices.

C. **The Fraudulent Scheme**

11. Prior to March 2020, TRBO's primary business purported to be collecting advertising revenue from video monitors that it installed in pharmacies throughout the United States.

12. In February 2020, TRBO issued two press releases announcing that it had formed a "strategic alliance" with BeMotion. Under this alliance, TRBO would purchase digital vending machines from BeMotion and install them in pharmacies with which TRBO had a relationship.

13. TRBO and BeMotion executed a written agreement regarding the vending machines in January 2020.

14. In March 2020, as the COVID-19 crisis escalated, BeMotion signed a contract with a company in China that manufactured thermal scanning equipment. The contract empowered BeMotion to sell the thermal scanning equipment outside of China. The scanning equipment could be installed in retail or other establishments to scan for persons with above normal body temperatures. BeMotion then began looking for possible distributors to assist with the sale of this product.

15. During March 2020, BeMotion shared a thermal scanning product brochure with TRBO. Singerman expressed to BeMotion an interest in TRBO becoming the exclusive distributor for the product. BeMotion's CEO responded that TRBO could not be an exclusive distributor and could only be a distributor if it had customers willing to buy the product.

16. BeMotion and TRBO never reached agreement on the terms of any distribution arrangement for the thermal scanning equipment.

17. During March 2020, Singerman asked the CEO of BeMotion whether he knew of anyone who might be interested in investing in TRBO. The CEO of BeMotion replied negatively.

18. On March 30, 2020, at around 3:30 p.m., TRBO issued a press release ("the March 30 release") drafted by Singerman, which contained a number of materially false and misleading statements.

19. The March 30 release falsely stated that BeMotion "is [the] front facing Partner in the multi-national public-private-partnership (PPP) for this innovation which simply stated, is **the only scanning technology on the planet with non-contact intelligent human temperature screening and facial recognition**." (Emphasis in original).

20. In fact, BeMotion was not engaged in any public-private partnership or any partnership involving a governmental entity. Further, the scanning equipment in question did not have facial recognition technology. The technology only had face detection ability (*i.e.*, it could distinguish a face from a cup of coffee).

21. The March 30 release further falsely stated that TRBO is "the lead intermediary" and "the U.S. Coordinating agent and Intermediary," suggesting that it was the authorized selling agent in the United States for this product.

22. In fact, prior to the release, BeMotion had advised TRBO that TRBO would not be allowed to be the sole U.S. distributor and that it could only distribute the equipment if TRBO had customers willing to buy it. Further,

no agreement relating to the scanning technology had been finalized between BeMotion and TRBO.

23. The March 30 release quoted the CEO of BeMotion as stating: "Our technology instantly <u>RED FLAGS</u> an elevated body temperature and is 99.99% accurate, and is the only system that includes both state-of-the-art human body temperature scanning and facial recognition…."

24. In fact, the CEO of BeMotion did not make or authorize the statement attributed to him, and as stated above, the technology did not have facial recognition capability, but only face identification technology. Further, the system is not the only system available with that ability.

25. The March 30 release further quoted the CEO of BeMotion as stating that: "TURBO and BeMotion, through our PPP are ready to deploy and help coordinate any expedited procurement process. After receipt of orders, systems ship in 5-days thereafter. *** This technology is designed to be deployed IMMEDIATELY in each State, with coordinated participation of Local, County, State and Federal Agencies working together to break the chain of virus transmission with early elevated fever detection."

26. In fact, the CEO of BeMotion did not make or authorize the above statement attributed to him. Moreover, BeMotion had advised TRBO,

through Singerman, that although BeMotion would be able to ship the systems in five days once BeMotion had an inventory of the systems in Canada, BeMotion could not presently ship the systems that quickly because it did not have the systems in Canada.

27. The press release touted that thermal scanning equipment as "the latest tool that can break the chain of virus transmission through early identification of elevated fever, one of the key early signs of COVID-19."

28. On April 3, 2020, TRBO issued another press release drafted by Singerman, in which Singerman "confirmed" that the Governor's offices for all 50 states and their Chiefs of Staff had been contacted regarding the availability of BeMotion's equipment, and that each office had been provided "the Technical Documents for our technology." Singerman also represented that he had personally contacted the CEOs for various major retail companies, such as Target, WalMart, and Costco, and "advised we are standing by to assist with expedited procurement."

29. In fact, TRBO did not have the technology it described as "our" technology, because no agreement had been entered into regarding the technology. Further, TRBO's "contact" with Governors, their Chiefs of Staff and major retailers consisted of unsolicited emails or faxes with false

information.  For example, one unsolicited email that Singerman sent to a major retailer claimed falsely that:  (i) TRBO "is the U.S. Lead and Intermediary of a private public partnership bringing this proven state-of-the-art technology to the U.S. now"; (ii) TRBO is "ready to ship 5 days from order"; and (iii) "States will be deploying [TRBO's product] after coordinating the Public Private Partnerships already organized at COVID-19 current screening areas already in place."

30.     TRBO's misleading releases materially affected the trading market for TRBO stock.  From March 16 through March 30, 2020 (the 11 trading days immediately preceding the March 30 release), TRBO trading volume averaged around 31.9 million shares per day, and the share price ranged between $0.0016 and $0.0059.  On March 31, the first trading day after the March 30 release, TRBO's trading volume jumped to 77.8 million shares and the share price hit an intraday high of $0.0068, before closing at $0.0044.

31.     On April 3 (when TRBO issued its press release regarding contacting all 50 Governors' offices), volume reached 76 million shares and the price hit an intra-day high of $0.0194, before closing at $0.0154.

## COUNT I

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
[15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]**

32.     The Commission realleges paragraphs 1 through 31 above.

33.     By the conduct alleged herein, Defendants TRBO and Singerman, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.     employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

34.     Defendants TRBO and Singerman knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, the defendants acted with scienter, that is, with an

intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

35. By reason of the foregoing, Defendants TRBO and Singerman, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the defendants named herein committed the violations alleged herein.

### II.

Permanent injunctions enjoining Defendants from violating, directly or indirectly, the laws and rules alleged in this complaint.

### III.

An order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting defendant Singerman from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section

12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### IV.

An order pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

### V.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

### JURY TRIAL DEMAND

The Commission hereby demands a jury trial as to all issues so triable. This 14th day of May, 2020.

>　*/s/ M. Graham Loomis*
> M. Graham Loomis
> Regional Trial Counsel
> Georgia Bar No. 457868
> loomism@sec.gov
>
> William P. Hicks
> Senior Trial Counsel
> Georgia Bar No. 351649
> hicksw@sec.gov

        Robert F. Schroeder
        Senior Trial Counsel
        Georgia Bar No. 001390
        schroederr@sec.gov


United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7600