**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>      Plaintiff,<br><br>      v.<br><br>**TURBO GLOBAL PARTNERS, INC., and ROBERT W. SINGERMAN,**<br><br>      Defendants. | **Civil Action File No.**<br>**8:20-cv-1120-T-30TGW** |

## PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF CIVIL MONETARY PENALTIES

Plaintiff, U.S. Securities and Exchange Commission ("Commission"), files this Motion and Memorandum of Law in Support of Civil Monetary Penalties against Defendants Turbo Global Partners, Inc. ("Turbo") and Robert W. Singerman ("Singerman") (collectively, "the Defendants"), as more fully set forth below.

### I. Overview

Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") provides that the Commission may seek to have a court impose civil monetary penalties for any violations of the Act. "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014); *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (noting that "penalties are designed to deter future violations of the securities laws and thereby further the goals of encouraging investor confidence, increasing

the efficiency of financial markets, and promoting the stability of the securities industry.").
Civil penalty amounts are adjusted periodically to the cost of living. *See* 17 C.F.R. § 201.1001, Adjustment of Civil Monetary Penalties – 1996. LEXSEE 66 FR 8761 at 8762.

The Defendants' misconduct in this case occurred primarily in March and April 2020, when they issued their false and misleading press releases. *See* Dkt. No. 1 (Complaint), ¶¶ 18, 28. Thus, the most-recent adjustments, for the period from November 3, 2015 to present, apply to the imposition of civil monetary penalties in this case. *See* Inflation Adjustments to the Civil Penalties Administered by the Securities and Exchange Commission (as of January 15, 2020) (attached hereto as Exhibit 1).

Section 21(d)(3) of the Exchange Act authorizes three tiers of civil monetary penalties against violators of the Act. *SEC v. BIH Corp.*, 2014 WL 7057748 at *2 (M.D. Fla. 2014); *see also* 15 U.S.C. § 78u(d)(3). First-tier penalties apply to any violations of the Act. *Id*. Second-tier penalties apply to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. Third-tier penalties apply to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*.

Pursuant to Section 21(d)(3) of the Exchange Act, the amount of a first-tier penalty for each violation shall not exceed the greater of (i) $9,639 for a natural person (Defendant Singerman) or (ii) $96,384 for any other person (Defendant Turbo). *See* Exhibit 1. The amount of a second-tier penalty for each violation shall not exceed the greater of (i) $96,384 for a natural person (Defendant Singerman) or (ii) $481,920 for any other person (Defendant Turbo). *Id*. The amount of a third-tier penalty for each violation shall not

exceed the greater of (i) $192,768 for a natural person (Defendant Singerman) or (ii) $963,837 for any other person (Defendant Turbo). *Id*.

As discussed in more detail *infra,* third-tier penalties are appropriate here because, as alleged in the Complaint, the Defendants' misconduct involved fraud and deceit and, at a minimum, presented a significant risk of substantial losses to unwary investors.

## II. <u>Civil Monetary Penalty Factors</u>

In determining whether to impose civil penalties and the amount of the fine, courts look to a number of factors, including: (1) the egregiousness of the defendants' conduct; (2) the degree of the defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty should be reduced due to the defendants' demonstrated current and future financial condition. *See, e.g. SEC v. Radius Capital Corp*, 2015 WL 1781567, *8 (M.D. Fla. Apr. 20, 2015). While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a "discretionary nature," and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).

Because the statute allows penalties "for each violation," some courts have imposed a separate penalty based upon the number of statutes violated. *Id.*, at 296 n. 13 (for four statutory violations and two rule violations, court noted that the second-tier penalty could be up to six times the then-applicable $50,000 statutory amount, or $300,000). Courts have also counted each false statement as a separate violation

3

subject to the tiered penalty limit. *See, e.g.*, *S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 592-94 (S.D.N.Y. 2014) (imposing separate penalty for each of defendant's seven false statements); *S.E.C. v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009) (imposing separate penalty for 18 violations of regulation); *S.E.C. v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) (imposing separate penalty for each of defendant's four false statements). Furthermore, the scienter of a control person can be imputed to a corporation. *See SEC v. Manor Nursing CTRS., Inc.*, 458 F.2d 1082, 1089 n. 3 (2d Cir. 1972) (holding that an individual's "knowledge is imputed to the corporations which he controlled.").

### III. <u>The Defendants' Misconduct</u>

As the Court is aware, the Judgments to which the Defendants consented preclude them from disputing the allegations in the Complaint for purposes of determining the appropriate civil monetary penalty amounts. *See* Dkt. No. 15 (Defendant Turbo's Consent), ¶ 3; Dkt. No. 17 (Defendant Turbo's Judgement), § III; Dkt. No. 14 (Defendant Singerman's Consent), ¶ 3; Dkt. No. 16 (Defendant Singerman's Judgement), § IV.

First, as to the egregiousness of the misconduct, the Defendants aggressively seized an opportunity to exploit the COVID-19 pandemic for themselves, to the detriment of an unwary public. Truth and fair dealing were casualties of their endeavor.

The Defendants issued materially false and misleading press releases in March and April 2020 that Defendant Singerman drafted, which claimed that Defendant Turbo was actively selling non-contact thermal scanning technology that:

(1) could scan large crowds to detect individuals with elevated fever, *see* Dkt. No. 1, ¶ 2;

4

(2) had a facial recognition capability, *id.*, ¶¶ 20, 23;

(3) was the only technology of its kind "on the planet", *id.*, ¶ 19;

(4) could be deployed immediately, *id.*, ¶¶ 2, 26; and,

(5) could be shipped to customers in five days, *id.*, ¶¶ 2, 26.

The Defendants' deceptive press releases further claimed that:

(6) Defendant Turbo was "the lead intermediary" and "U.S. Coordinating agent and Intermediary" for the thermal scanning technology, *id.*, ¶¶ 2, 21-22;

(7) BeMotion (a technology company in Canada that signed a contract with a Chinese company to sell the thermal scanning technology outside of China) was a participant in a "multi-national public-private partnership" for the thermal scanning technology, *id.*, ¶¶ 10, 14, 19-20, 26; and,

(8) BeMotion and Turbo were coordinating with "Local, County, State and Federal Agencies … to break the chain of virus transmission …", *id.*, ¶ 25.

In addition, the Defendants

(9) fabricated a quotation in one of their press releases which they attributed to Hussein Abu Hassan, BeMotion's CEO, without his knowledge or authorization, *id.*, ¶¶ 23-26, *see also* Exhibit 2 ("Declaration of Hussein Abu Hassan"), ¶ 12,

(10) falsely claimed in one of their press releases that the thermal scanning technology belonged to it ("our technology"), Dkt. No. 1, ¶¶ 28-29, and

(11) sent e-mails to the CEO's of various major retail companies, and U,S. Governors and their Chiefs of Staff (which they referenced in one of their press releases), which contained false and misleading representations, including that "States will be

deploying [Turbo's technology] … at COID-19 current screening areas …", and "we are standing by to assist with expedited procurement", *id.*, ¶¶ 28-29.

The egregiousness of the Defendants' misconduct is further reflected in Mr. Hassan's Declaration, including his assertion that, when he told Defendant Singerman that a Commission attorney had contacted BeMotion and requested an opportunity to speak to him, Defendant Singerman told him that he should not do so. *See* Exhibit 2, ¶ 11.

Moreover, Defendant Singerman is a recidivist. He was previously prosecuted by the Commission and sanctioned by this Court for his violations of the federal securities laws, and permanently enjoined from doing so again. *See* Dkt. No. 1, ¶¶ 1, 9.

By way of background, the Commission previously filed a Complaint for injunctive and other relief against Defendant Singerman and other defendants in 1999, for utilizing high-pressure sales tactics in their ongoing, fraudulent offer and sale of unregistered securities to unsophisticated investors through a network of "boiler rooms" in Florida and California. *See* Exhibit 3 (SEC v. Physicians Guardian Unit Investment Trust, et. al., Case No. 8:99-cv-01117-EAK (M.D. Fla. May 12, 1999). On July 17, 2000, a final judgement was entered against Defendant Singerman, in which he agreed to the entry of a permanent injunction, disgorgement of $78,210 plus interest, a civil penalty in an amount to be determined by the Court, and the continuation of an asset freeze against him. *See* Exhibits 4 (Consent of Defendant Robert W. Singerman to the Entry of Final Judgement of Permanent Injunction and Other Relief) and 5 (Final Judgement of Permanent Injunction and Other Relief as to Defendant Robert W. Singerman).

Second, as to the degree of scienter involved, and as made manifest by the Commission's Complaint, the Defendants' Consents and the Court's Judgments, the Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder involved fraud and deceit in the dissemination of information they knew to be materially false and misleading to the public, as well as in their concealment of material information from it.

Third, the Defendants' fraud and deceit created, at a minimum, a significant risk of substantial losses to other persons. The Defendants' deceptive practices substantially increased both the trading volume and share price of Defendant Turbo's shares, see Dkt. No. 1, ¶ 3, which directly inured to Defendant Singerman's benefit. According to Defendant Singerman, he was Defendant Turbo's largest shareholder, and owned approximately 225 Million of its 500 Million shares. See Exhibit 6 (Declaration of Robert F. Schroeder), ¶ 6.

In the days immediately following the Defendants' materially false and misleading press releases, Defendant Turbo's trading volume more than doubled, from an average of approximately 31.9 million shares per day to a range of approximately 76 – 77.8 million shares per day, and its share price increased from a range of $0.0016 - $0.0059 to intra-day highs from $0.0068 to $0.0194. See Dkt. No. 1, ¶¶ 3, 30–31. As a result of the Defendants' misconduct, which quickly and artificially inflated the price of Defendant Turbo's shares, and presented the likelihood of sustained, substantial losses to unwary investors if left unchecked, the Commission temporarily suspended trading in them, from April 9, 2020 to April 23, 2020. Id., ¶ 8.

Fourth, the Defendants' misconduct in this case was not isolated but recurrent. This is not Defendant Singerman's maiden voyage. As previously stated, due to Defendant Singerman's earlier violations of the federal securities laws, the Commission filed a Complaint against him and other defendants in 1999, which resulted in this Court's previous Judgement against him. *See* Exhibits 3, 4 and 5. As part of its Judgement, the Court permanently enjoined Defendant Singerman from violating various provisions of the federal securities laws, including Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the very statute that the Defendants *have* violated in this case. *See* Exhibit 5. Unfortunately, the Court's Judgement did not have its intended, salutary effect upon Defendant Singerman's behavior. Rather, it seems that Defendant Singerman's previous encounters with the Commission and this Court have only served to embolden him. Whereas Defendant Singerman targeted unsophisticated investors as victims in his earlier case, the Defendants attempted to deceive unwary investors <u>and</u> CEO's of major retail companies <u>and</u> high-ranking public officials throughout the country in this one.

The Commission believes that the Court should issue appropriate third-tier civil monetary penalties against the Defendants in this case, which, hopefully, will have a positive impact upon them this time, and deter them from committing future violations of the federal securities laws. *See SEC v. v. Eddy U Marin*, Case No. 1:18-cv-21744 (S.D. Fla. Apr. 17, 2020) (ordering in bifurcated proceeding a $160,000 penalty for control person of penny stock firm that orchestrated pump and dump scheme through false press releases).

Fifth, as to whether any civil monetary penalty amounts should be reduced due to the Defendants' demonstrated current and future financial condition, the Commission

cannot fully address this factor at this point, because it has not seen any financial information for Defendant Turbo or Defendant Singerman.[1]

The Commission notes that in the Court's Judgement in Defendant Singerman's previous case, there is a reference to a bankruptcy petition that Defendant Singerman filed in 1999, which was pending at the time. *See* Exhibit 5, ¶ VI, p.6. Defendant Singerman filed his bankruptcy petition on October 15, 1999, approximately five months *after* the Commission filed its Complaint against him. *See* Exhibit 7, Dkt. No. 1 (Docket Sheet for Bankruptcy Petition No. 8:99-bk-16790-TEB). According to the Court's Judgement, the disgorgement amount ($78,210) and any civil monetary penalty amount that it imposed in the case would be pursued as claims against Defendant Singerman in his bankruptcy action. *See* Exhibit 5, ¶ VI, p.6.

Even if Defendant Singerman argues that he is impecunious in this case, such argument deserves little weight given that he failed to pay his prior Judgment. Specifically, according to the Commission's Office of Collections, Defendant Singerman only paid $2,075.00 of the total amount due of $97,876.31 ($78,210 disgorgement amount plus $19,666.31 in post-judgment interest). *See* Exhibit 6, ¶ 12.

Moreover, on April 16, 2003, the Commission filed a motion to dismiss its claim for a civil monetary penalty against Defendant Singerman, based upon "his assertion of an inability to pay a civil penalty." *See* Exhibit 8 (Plaintiff Securities and Exchange Commission's Motion to Dismiss Certain Claims for Relief as to Defendants Singerman [and other defendants]). On April 22, 2003, the Court granted the Commission's Motion.

---

[1] On July 7, 2020, the Commission served its First Request for Production of Documents on the Defendants. Their responses were due by August 6, 2020, but they never provided them to the Commission.

9

*See* Exhibit 9 (Order Dismissing Certain Claims against Defendants Singerman [and other defendants]).

If the Defendants claim that they are unable to pay civil penalties in this case, the Court should consider several additional factors when deciding how much weight to give it, including that: (1) the Commission did not seek any financial penalty in Defendant Singerman's prior case because of his financial condition, and he never paid the full amount of his disgorgement order. These facts, coupled with Defendant Singerman's recidivist history, suggest that a significant penalty is necessary in this case in order to deter him from future violations; and, (2) multiple courts have held that financial penalties can be appropriate even when a defendant claims he is impecunious because of the need to deter such misconduct in the future. *See, e.g., SEC v. Warren,* 534 F.3d 1368, 1370 (11th Cr. 2008) ("nothing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay."); *SEC v. Monterosso*, 2012 WL 12948750, *6 (S.D. Fla. Oct. 17, 2012) ("based on the egregiousness of the violations in this case, [defendant's] present financial condition should not bar a civil penalty altogether.").

In addition, the Commission should be permitted to take discovery if the Defendants claim they are unable to pay civil penalties in order to probe their claim, and be given leave to file a reply brief to respond to it, since it is entitled to do so pursuant to the terms of the Defendants' Consents. *See* Dkt. Nos. 14, ¶ 3, and 15, ¶ 3.

Finally, Defendant Singerman has not been honest with the Commission. During the Commission's telephonic interview of Defendant Singerman on April 14, 2020, he falsely claimed that he had previously paid the $78,210 disgorgement amount ordered by

10

the Court, over a three-year period. *See* Exhibit 7, ¶¶ 8, 11. Furthermore, he falsely claimed during the interview that he did not engage in fraudulent activity in connection with the Commission's previous Complaint against him. *Id.*, ¶¶ 8-10; *compare* Dkt. No. 1, ¶¶ 1, 9. Defendant Singerman's claims were also contrary to the terms of the Court's previous Judgement against him. *Compare* Exhibits 4, ¶ 6, and 5, ¶ V.

If the Defendants are experiencing financial difficulties at present, the Court should still impose necessary and appropriate third-tier civil monetary penalties against them due to their significant misconduct, in the event their financial condition was to change in the future.

### IV. <u>Conclusion</u>

Wherefore, the Court should impose third-tier civil monetary penalties against the Defendants, in amounts that the Court determines to be appropriate.

Dated: August 20, 2020           Respectfully submitted,

*/s/ Robert F. Schroeder*

Robert F. Schroeder
Georgia Bar No. 001390
schroederr@sec.gov
404-942-0688

William P. Hicks
Georgia Bar No. 351649
hicksw@sec.gov
404-842-7675

U. S. Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326

## CERTIFICATE OF SERVICE

On August 20, 2020, I served the foregoing **PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF CIVIL MONETARY PENALTIES** upon Defendants Turbo Global Partners, Inc., and Robert W. Singerman, at the electronic and physical addresses Defendant Singerman provided for them, as set forth below:

**Via E-Mail (bobs@turboglobalpartners.com) & USPS Overnight Delivery**

Turbo Global Partners, Inc., and Robert W. Singerman
2202 N. West Shore Blvd.
Suite 200
Tampa, Florida 33604

*/s/ Robert F. Schroeder*