Exhibit 3

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### (Tampa Division)

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 99-1117-CIV-T-17A |
| | ) | |
| PHYSICIANS GUARDIAN UNIT INVESTMENT | ) | COMPLAINT FOR |
| TRUST, by and through its Trustee, PHYSICIANS | ) | INJUNCTIVE AND |
| GUARDIAN, INC.; PHYSICIANS GUARDIAN, | ) | OTHER RELIEF |
| INC.; PHYSICIANS GUARDIAN INSURANCE | ) | |
| CORP.; ABFAC, INC.; TEL COM PLUS EAST, | ) | |
| L.L.C.; TEL COM PLUS WEST, L.L.C.; | ) | |
| CHARLES POLLEY; and ROBERT W. | ) | |
| SINGERMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Securities and Exchange Commission ("Commission"), alleges that:

### INTRODUCTION

1.     The Commission brings this action to restrain and enjoin Defendants Physicians Guardian Unit Investment Trust (the "PG Trust"), Physicians Guardian, Inc. ("PGI"), Physicians Guardian Insurance Corp. ("Physicians Guardian"), ABFAC, Inc., Charles Polley ("Polley"), and Robert W. Singerman (collectively the "PG Defendants") from continuing to violate the federal securities laws in connection with the ongoing, fraudulent offer and sale of unregistered securities.  Through a network of "boiler rooms" in Florida and California that utilize high-pressure telemarketing sales tactics, the PG Defendants are fraudulently offering and selling unregistered securities in the form of "units" in the PG Trust to unsophisticated investors.

2.     While the PG Defendants represent to prospects and investors that the funds invested in the PG Trust will be used to purchase an interest in an offshore medical malpractice insurance company, in reality there is no business and the PG Defendants really intend to keep 60% of the monies raised as commissions, costs, and fees.  Upon information and belief, the PG Defendants have raised more than $4 million from investors thus far.  Unless immediately restrained and enjoined, the PG Defendants will continue to defraud the public.

3.     The PGI offering is the second unregistered, fraudulent offering devised and orchestrated by Defendant Polley.  Before launching PGI, Polley offered and sold a similarly-structured investment in two related "prepaid telephone companies" named Tel Com Plus East, L.L.C. and Tel Com Plus West, L.L.C. (collectively "Tel Com Plus"). From September 1997 to October 1998, at least $14.6 million was raised from investors through the Tel Com Plus offering.   While that offering is now closed, the PGI offering is ongoing.

## DEFENDANTS

4.     Defendant Physicians Guardian Unit Investment Trust (the "PG Trust") purports to be an "unit investment trust."

5.     Defendant Physicians Guardian, Inc. ("PGI") was incorporated in Florida in April 1998 and maintains its principal offices at 13902 N. Dale Mabry, Suites 212 and 214, Tampa, Florida 33618.  PGI is the issuer of the unregistered PG Trust "units" described herein and the trustee of the PG Trust.

6.     Defendant Physicians Guardian Insurance Corp. ("Physicians Guardian") purports to be a medical malpractice insurance company licensed and domiciled in the

Cayman Islands.   Physicians Guardian maintains offices at 13902 N. Dale Mabry, Suite 214, Tampa, Florida 33618.

7.   Defendant ABFAC, Inc. ("ABFAC") was incorporated in Florida in October 1998 and maintains its principal offices at 13902 N. Dale Mabry, Suite 212, Tampa, Florida 33618.   ABFAC serves as the administrative arm of PGI and is responsible for taking in investor funds and processing paperwork.

8.   Defendant Tel Com Plus East, L.L.C. was organized in Florida in April 1997 and maintained its principal offices at 13902 N. Dale Mabry, Suite 149, Tampa, Florida 33618.   It purports to be a telephone company that provides prepaid local and long distance telephone service to the credit-impaired in the region east of the Mississippi.

9.   Defendant Tel Com Plus West, L.L.C. was organized in Florida in July 1997 and maintained its principal offices at 13902 N. Dale Mabry, Suite 149, Tampa, Florida 33618.   It purports to be a telephone company that provides prepaid local and long distance telephone service to the credit-impaired in the region west of the Mississippi.

10.   Defendant Charles Polley ("Polley") is described to investors as the "CEO of Physicians Guardian." Polley was also the chairman of the entity that served as a "co-managing member" of Tel Com Plus. He resides in Tampa, Florida.

11.   Defendant Robert W. Singerman ("Singerman") is the president and a director of PGI and the executive vice president of Physicians Guardian. He is also one of five trustees of the PG Trust. He resides in Lutz, Florida.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

13.     Certain of the acts and transactions constituting violations of the Securities Act and the Exchange Act have occurred within the Middle District of Florida.   The principal offices of Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, and Tel Com Plus are located within the Middle District of Florida.   Defendants Polley and Singerman reside in the Middle District of Florida.   Defendants have engaged in many of the acts and practices complained of herein within the Middle District of Florida.

14.     Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business complained of herein.

## THE FRAUDULENT SCHEME

### The Physicians Guardian Offering

15.     From at least October 1998 and continuing to the present, the PG Defendants have been offering and selling the general public unregistered securities in the form of "units" in the PG Trust (the "Physicians Guardian offering").   The PG Defendants are offering the units for sale for $22,000 per unit for a total offering of approximately $8 million.   Investors are told that the funds from the offering will be used to purchase a 40% interest in Physicians Guardian.   Upon information and belief, the PG

Defendants have thus far raised more than $4 million from investors. The Physicians Guardian offering is ongoing.

16.     The PG Trust units are securities as defined by Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(10). No registration statement was filed or is in effect pursuant to the Securities Act in connection with these offers and sales.

17.     The PG Defendants market the units through a network of "boiler rooms" in Florida and California. The telemarketers use high-pressure sales techniques when soliciting investors and "cold-call" prospects throughout the country. If a prospective investor expresses interest in the offering and has funds immediately available, the telemarketer send the prospect a package of PGI offering materials by overnight delivery.

18.     The telemarketer later calls to make sure the prospect has received the offering materials, to answer any questions or address any objections the prospect might have, and finally, to solicit the investment. The sales techniques are designed to create a sense of urgency in the investor. Once prospects are persuaded to invest, the telemarketers tell the prospects to sign the documents included in the offering materials and send them, along with their funds, to PGI's administrative arm, ABFAC.

19.     Prospects are also encouraged to invest savings, including funds in Individual Retirement Accounts and pension savings plans. No registration statement has been filed with the Commission in connection with the PGI offering. In addition, the boiler rooms have never been registered with the Commission as broker-dealers during the relevant period.

### The Physicians Guardian Offering Materials

20.     Prospective investors receive a package of offering materials describing the Physicians Guardian  investment.  The offering materials include a high-quality color sales brochure, a "confidential private offering memorandum," and a set of subscription documents.  Prospects also receive payment instructions, a pre-addressed FedEx shipping label, a newsletter, and corporate updates.  Prospects are also encouraged to visit the Physicians Guardian web site.

21.     Physicians Guardian bills itself as an insurance company owned and operated by doctors, for doctors.  In the brochure, investors are told that Physicians Guardian will offer the "highest quality liability coverage to U.S. physicians, at rates up to 20% below their current annual premiums."  The company claims it will be able to offer these discounts because it will target only those doctors with a history of practicing "good medicine."   All applicants will purportedly be screened by a medical advisory board of up to nine "eminent physicians, who are also directors of the company." Information gathered by the medical advisory board will purportedly be sent to the company's reinsurer, "whose industry experts pass the final judgment on each applicant."

22.     Physicians Guardian also boasts that it has engaged a group of first-rate "Professional Advisors" who will ensure that the company manages risk successfully.  In addition, three full pages of the brochure are dedicated to highlighting the credentials of PGI's and Physicians Guardian's key personnel.

23.     The offering materials also include a 29-page "confidential private offering memorandum," which contains a section discussing the use of proceeds.  The use

of proceeds section indicates that 40%, or $3.2 million, of the $8 million to be raised from investors will be used to purchase a stake in Physicians Guardian.

24.     It appears from the use of proceeds section that the remaining 60% of the offering proceeds will go towards a dozen other ill-defined items, such as "Business Development," "Licenses and Permits," "Production Costs," "Administrative and Business Expense," "Market Consultation," "Market Analysis," and "Management Fee." If read painstakingly, this ambiguous section indicates that 60% of investor funds ill be used to pay commissions, fees and costs associated with the offering.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS
## IN CONNECTION WITH THE PHYSICIANS GUARDIAN OFFERING

25.     The Physicians Guardian offering materials contain material misrepresentations and omissions concerning, among other things, the engagement of the company's "Professional Advisors," a contract and business alliance with an established insurance carrier, its financial projections, the use of investor proceeds, its authority to transact insurance business in various states, and the background and experience of PGI's and Physicians Guardian's principals.

### Physicians Guardian's "Professional Advisors"

26.     The Physicians Guardian sales brochure contains a two-page spread touting Physicians Guardian's engagement of a team of "Professional Advisors," which includes, among others, auditors KPMG Peat Marwick ("KPMG"), reinsurance broker Intere Intermediaries, Inc. ("Intere"), and actuaries Milliman & Robertson.

27.     Investors are told, for example, that KPMG provides audit services to over 30% of the captive insurance companies licensed in the Cayman Islands and that it is the

only accounting firm in the Cayman Islands with a resident U.S. tax department, which allows it "to provide integrated, multi-disciplinary advice and services to a company like Physicians Guardian."

28.     Investors are also told that Intere is an "international reinsurance broker" whose depth of experience assures that Physicians Guardian "will at all times enjoy the most competitive rates from its principle reinsurers."

29.     Milliman & Robertson is described as being "among the largest actuarial and management consulting firms in the United States," and having "extensive experience relating to captive insurance companies throughout the world . . ." During telephone solicitations, the telemarketers emphasize that Physicians Guardian is under the stewardship of these "Professional Advisors," virtually assuring the company's success.

30.     The representations regarding the company's engagement of these "Professional Advisors" are false and misleading because Physicians Guardian has not, in fact, retained any of these advisors or established any business relationship with them.  In reality, neither KPMG nor  Milliman & Robertson has ever had any dealings with PGI or Physicians Guardian.  Further, Intere has been defunct since 1995.

### Alliance with Established Insurance Carrier

31.     A memorandum sent to prospects also states that Physicians Guardian has entered into a contract to "piggy-back" onto an established insurance company's existing network, purportedly allowing Physicians Guardian to use the established insurance company's licenses to issue policies in individual states.  The contract is described as a "major coup."  Investors are also told that this "new partner" was so impressed with its operations that meetings were underway to "expand upon the already signed contract and

work out an even deeper involvement and alliance between both companies." Investors are also assured that the new business partner "will be actively engaged in supporting [Physicians Guardian] to fulfill [its] projections as well as significantly outperforming them." Investors are told that the new partner has been confirmed as either "Fireman's Fund, All State [sic] or Farmer's Insurance."

32.     PGI's representations to investors about its "new business partner" are blatantly false. Allstate Insurance Company ("Allstate") , the Farmers Insurance Group of Companies ("Farmers Insurance"), and Fireman's Fund Insurance Company ("Fireman's Fund") confirmed that they have never entered into any contracts or alliances with Physicians Guardian. Although Fireman's Fund indicated that it had been contacted by a consultant representing Physicians Guardian inquiring about a fronting carrier agreement, these discussions were preliminary and non-substantive.

## Financial Projections

33.     The offering package includes a five-year financial summary in which Physicians Guardian projects it will enroll 800 doctors in its insurance program in its first year of operations and take in $20 million in annual premiums.   By its fifth year of operation, Physicians Guardian projects it will take in $100 million in annual premiums and have an enrollment of 4,000 doctors.

34.     The financial summary states that investors can expect to earn a 22% annual return on their investment in the first year, 45% the second year, 69% the third year, 93% the fourth year, and 119% the fifth year.  The telemarketers tell investors that these exorbitant returns are "conservative."  Investors are also told that in addition to

these returns, their units will appreciate in value because each year the company will have built up its cash holdings and excess reserve pool.

35.     The offering materials and telephone solicitations make clear that the company's success is based upon the involvement of the company's "Professional Advisors" and the contract and alliance with either Fireman's Fund, Allstate or Farmers Insurance, its purported "new business partner."   These financial projections and anticipated returns, however, are false and misleading because they are predicated on the non-existent relationships with the much-touted "Professional Advisors" and a non-existent contract and business alliance with an established insurance company.   Given that the "Professional Advisors" have no involvement whatsoever with Physicians Guardian and that the company has no contract or business alliance with Fireman's Fund, Allstate or Farmers Insurance, there is no reasonable basis for the financial projections.

## Authority to Transact Insurance Business in Various States

36.     The offering materials and telemarketers also lead prospects to believe that Physicians Guardian is authorized to transact insurance business in several states, and that it is already accepting applications from doctors.   Specifically, investors are being told that Physicians Guardian is licensed to operate as an insurance company in Florida, Georgia, and California.   Prospects are also told that the company has already entered into an agreement with a "pre-paid medical network in Atlanta, Georgia numbering 650 physicians" to offer malpractice coverage as part of its benefits package for members. Investors are also told that 80 to 250 doctors from an independent physicians association are going to be signed up.   They are also told that 300 doctors have already applied for coverage with Physicians Guardian.   In truth, Physicians Guardian is not licensed or

10

authorized to transact insurance business in Florida, Georgia, or California. This fact calls into question its representation to investors that it has already signed up and accepted applications from doctors.

## Backgrounds of Principals

37.    The PGI offering materials also contain false and misleading information about Physicians Guardian's and PGI's personnel.  For example, Howard W. Kratz ("Kratz") is described as a "recognized leader in the development of computerized management systems for physicians and medical clinics" who brings "extensive computer systems experience to the company."  The offering materials fail to disclose, however, that Kratz has been the subject of two cease-and-desist orders in connection with the prior Tel Com Plus offering.

38.    The offering materials also profile Richard M. Owers ("Owers") as being an attorney with "over 27 years experience in personal injury law, with successful representation of over 35,000 personal injury cases."  Investors are told that he brings "an invaluable legal perspective to Physicians Guardian."  Owers is represented to have received his law degree from the Boston University School of Law in Boston, Massachusetts.   In fact, Owers never graduated from or even attended the Boston University School of Law.

39.    The offering materials also profile Lynn Murphy ("Murphy").  Murphy is said to bring "global perspective of the insurance industry" to PGI having been "actively involved in the development of captive insurance companies since 1988."  The materials state that Murphy currently holds a life and health insurance license from North Carolina. This information is false as Murphy's license was canceled more than three years ago.

11

40.     Finally, telemarketers orally tout Polley's background to prospective investors.  At least one prospect investor was told that Polley is a former vice president of Oppenheimer Funds.  The representations being made to prospects about Polley are materially false and misleading and omit material facts.  In fact, Polley was never employed by Oppenheimer Funds in any capacity and has been the subject of at least three state cease-and-desist orders in connection with the prior Tel Com Plus offering.

## ROLE OF POLLEY AND SINGERMAN
## IN THE PHYSICIANS GUARDIAN OFFERING

41.     Polley is described to prospects as the "CEO of Physicians Guardian." While soliciting investors, the telemarketers frequently refer to him as the person with key information about Physicians Guardian's operations, such as the number as doctors enrolled in the program and where it is licensed to sell insurance.  Polley also participated in the creation of the PGI offering materials.

42.     Singerman is the president and a director of PGI and the executive vice president of  Physicians Guardian.  As such, Singerman is responsible for managing the day-to-day affairs of PGI and Physicians Guardian.  His background and experience are profiled in the sales brochure.  He also frequently speaks directly with prospects and answers specific questions about Physicians Guardian's operations and finances.  For example, he discusses with prospects the engagement of KPMG and Milliman & Robertson as the company's "Professional Advisors," the financial projections, the agreements with independent physicians associations, and the applications being received from doctors.  He also communicates with prospects and investors in writing through a newsletter.  In addition, Singerman recruits other telemarketers to sell the offering.

## THE PATTERN OF FRAUD

### The Tel Com Plus Offering

43.     The PGI offering is the second unregistered, fraudulent offering devised by Polley to defraud the investing public.  Before launching PGI, Polley offered and sold unregistered securities in the form of units of interest ("units") in Tel Com Plus.  From approximately September 1997 to October 1998, Tel Com Plus raised at least $14.5 million from investors nationwide (the "Tel Com Plus offering").  Investors were told that their funds would be used to operate and expand a telephone company that offered prepaid local and long distance service to the credit-impaired.

44.     Tel Com Plus offered for sale 22,000 units at prices ranging from approximately $7,500 to $9,500 per unit.  As with PGI, the Tel Com Plus offering was offered and sold through a network of telemarketing organizations in Florida and California. The telemarketers "cold-called" prospective investors and used "boiler room" sales techniques in their solicitation of investors.  Like PGI, investors in Tel Com Plus received a package of offering materials consisting of a color sales brochure, an offering memorandum, and other documents.  No registration statement was filed with the Commission in connection with the Tel Com Plus offering.

### MATERIAL MISREPRESENTATIONS AND OMISSIONS IN CONNECTION WITH THE TEL COM PLUS OFFERING

45.     The Tel Com Plus offering materials contained material misrepresentations and omissions concerning the background and experience of its principals and the use of investor proceeds.

## Use of Investor Proceeds

46.     The Tel Com Plus offering materials lead investors to believe that most of their funds would be used to operate and expand the business nationwide and that no more than 3 1/2% of the total cash capitalization would be used for fees and expenses. The offering materials failed to disclose, however, that more than 40% of the funds raised from investors were used to pay sales commissions to the network of boiler rooms that participated in the offering.

## Backgrounds of Principals

47.     The Tel Com Plus offering materials contained profiles of the company's "Key Personnel."   For example, investors were told that Polley was a Wharton graduate and a former "National Vice President of Oppenheimer."  In fact, Polley never graduated from or even attended Wharton.   Nor was he ever employed in any capacity by Oppenheimer Funds or Oppenheimer & Co. as investors are led to believe.   Rather, Polley was employed by Oppenheimer Industries, Inc., a cattle company in Kansas City, Missouri.

48.     The offering materials also profiled Joseph P. Cillo ("Cillo"), who was described as a "legal consultant" and director.  Investors were told that Cillo "serves Tel Com Plus in the areas of compliance, mergers and acquisitions and planning for an initial public registration."   The offering materials failed to disclose, however, that Cillo is a recidivist securities law violator, who was also forced to resign from the Florida Bar in lieu of discipline.

49.     William Van Aken ("Van Aken") is also listed among the "Key Personnel" in the Tel Com Plus offering materials. Van Aken is described as a graduate

of the University of Iowa, who "began his telecommunications career with GTE Mobilnet in 1992," and in 1994, "became the overall manager of GTE's largest agent network in Florida . . . ." In fact, Van Aken never graduated from the University of Iowa and was never employed by GTE Mobilnet.

50.     The Tel Com Plus offering materials also failed to disclose that numerous states had issued cease-and-desist orders against, among others, Tel Com Plus and Polley, for violations of the registration and antifraud provisions of their respective state securities laws.   From late January to early October 1998, during the period when investors were actively being solicited, five states issued cease-and-desist orders against Tel Com Plus and its principals for fraud and selling unregistered securities.   The Tel Com Plus offering materials were never revised or supplemented to inform prospective investors about the cease-and-desist orders, even though the materials were frequently updated with new information about Tel Com Plus.   Nor did the telemarketers disclose to prospects that cease-and-desist orders had been issued.

## ROLE OF POLLEY IN THE TEL COM PLUS OFFERING

51.     Polley was chairman of the entity that was a "co-managing member" of Tel Com Plus.   As such, he was responsible for managing the day-to-day affairs of Tel Com Plus.   His background and experience were profiled in the Tel Com Plus sales brochure.   Polley coordinated the sales efforts of the telemarketers and provided them with sales brochures and other materials about the Tel Com Plus offering.   He also recruited telemarketers to sell the offering.   Polley spoke directly with at least one prospect and encouraged him to invest in Tel Com Plus.   He also communicated with prospects and

investors in writing through various memoranda regarding the progress of Tel Com Plus.

Further, he signed the Tel Com Plus operating agreement included in the offering materials.

## COUNT I

### SALE OF UNREGISTERED SECURITIES IN VIOLATION OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT (Tel Com Plus and Polley)

1.     The Commission repeats and realleges paragraphs 1 through 51 of this Complaint.

2.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described herein.

3.     Since at least December 1997 through October 1998, Defendants Tel Com Plus and Polley, directly and indirectly, have:

(a)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or

(c)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell

or offer to buy through the use or medium of any prospectus or

otherwise, as described herein,

without a registration statement having been filed or being in effect with the Commission as

to such securities.

4.      By reason of the foregoing, Defendants Tel Com Plus and Polley have

violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the

Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### SALE OF UNREGISTERED SECURITIES IN VIOLATION OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT
### (The PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman)

1.      The Commission repeats and realleges paragraphs 1 through 51 of this

Complaint.

2.      No registration statement was filed or in effect with the Commission

pursuant to the Securities Act with respect to the securities and transactions described

herein.

3.      Since at least October 1998 and continuing through to the present,

Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman,

directly and indirectly, have:

(a)      made use of the means or instruments of transportation or

communication in interstate commerce or of the mails to sell

securities as described herein, through the use or medium of a

prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be

carried through the mails or in interstate commerce, by any means or

instruments of transportation, for the purpose of sale or delivery after

sale; and/or

(c)     made use of the means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell

or offer to buy through the use or medium of any prospectus or

otherwise, as described herein,

without a registration statement having been filed or being in effect with the Commission as

to such securities.

4.     By reason of the foregoing, Defendants the PG Trust, PGI, Physicians

Guardian, ABFAC, Polley, and Singerman, have violated, and unless enjoined, will

continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and

77e(c).

## COUNT III

**FRAUD IN VIOLATION OF
SECTION 17(a)(1) OF THE SECURITIES ACT
(Tel Com Plus and Polley)**

1.     The Commission repeats and realleges paragraphs 1 through 51 of the

Complaint.

2.     Since at least December 1997 through October 1998, Defendants Tel Com

Plus and Polley, directly and indirectly, by use of the means or instruments of transportation

or communication in interstate commerce or by use of the mails, in the offer or sale of

securities, as described herein, have knowingly or recklessly employed devices, schemes or artifices to defraud.

3.      By reason of the foregoing, Defendants Tel Com Plus and Polley have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT IV

**FRAUD IN VIOLATION OF
SECTION 17(a)(1) OF THE SECURITIES ACT
(The PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman)**

1.      The Commission repeats and realleges paragraphs 1 through 51 of the Complaint.

2.      Since at least October 1998 and continuing through to the present, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, as described herein,  have knowingly or recklessly employed devices, schemes or artifices to defraud.

3.      By reason of the foregoing, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT V

### FRAUD IN VIOLATION OF
### SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (Tel Com Plus and Polley)

1.     The Commission repeats and realleges paragraphs 1 through 51 of its Complaint.

2.     Since at least December 1997 through October 1998, Defendants Tel Com Plus and Polley, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, as described herein, have knowingly or recklessly:

    (a)     employed devices, schemes or artifices to defraud;

    (b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    (c)     engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

3.     By reason of the foregoing, Defendants Tel Com Plus and Polley have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

## COUNT VI

### FRAUD IN VIOLATION OF
### SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (The PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman)

1.      The Commission repeats and realleges paragraphs 1 through 51 of its Complaint.

2.      Since at least October 1998 and continuing through to the present, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, as described herein, have knowingly or recklessly:

        (a)      employed devices, schemes or artifices to defraud;

        (b)      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

        (c)      engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

3.      By reason of the foregoing, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

## COUNT VII

### FRAUD IN VIOLATION OF
### SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT
### (Tel Com Plus and Polley)

1.    The Commission repeats and realleges paragraphs 1 through 51 of its Complaint.

2.    Since at least December 1997 through October 1998, Defendants Tel Com Plus and Polley, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, as described herein, have:

> (a)    obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

> (b)    engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

3.    By reason of the foregoing, Defendants Tel Com Plus and Polley have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## COUNT VIII

### FRAUD IN VIOLATION OF
### SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT
### (The PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman)

1.      The Commission repeats and realleges paragraphs 1 through 51 of its Complaint.

2.      Since at least October 1998 and continuing through to the present, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, as described herein, have:

        (a)      obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

        (b)      engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

3.      By reason of the foregoing, Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Tel Com Plus, Polley, and Singerman committed the violations of the federal securities laws alleged herein.

### II.

### Temporary Restraining Order, Preliminary and Permanent Injunctive Relief

Issue a Temporary Restraining Order, a Preliminary Injunction and a Permanent Injunction, restraining and enjoining:

Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating: (a) Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); (b) Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a); (c) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; and (d) Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## III.

### **Permanent Injunctive Relief**

Issue a Permanent Injunction, restraining and enjoining:

Defendants Tel Com Plus and Polley, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating:  (a) Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); (b) Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a); (c) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; and (d) Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## IV.

### **Disgorgement**

Issue an Order requiring Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Tel Com Plus, Polley, and Singerman, jointly and severally to disgorge all ill-gotten profits or proceeds that they have received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## V.

### **Penalties**

Issue an Order directing Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Tel Com Plus, Polley, and Singerman to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## VI.

### Asset Freeze and Accounting

Issue an Order temporarily freezing the assets of Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, until further Order of the Court, and requiring accountings by the PG Trust, PGI, Physicians Guardian, ABFAC, Tel Com Plus, Polley, and Singerman.

## VII.

### Appointment of Receiver

Issue an Order appointing a Receiver of the assets of the PG Trust, PGI, Physicians Guardian, and ABFAC, to marshall and safeguard all of said assets, and any other duties the Court deems appropriate, and to prepare a report to the Court and the Commission detailing the activities of the PG Trust, PGI, Physicians Guardian, and ABFAC and the whereabouts of investor funds.

## VIII.

### Records Preservation and Expedited Discovery

Issue an Order requiring Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman to preserve any records related to the subject matter of this lawsuit that are in their custody, possession or subject to their control, and to respond to discovery on an expedited basis.

## IX.

### Repatriation of Investor Proceeds

Issue an Order requiring Defendants the PG Trust, PGI, Physicians Guardian, ABFAC, Polley, and Singerman, to take such steps as are necessary to repatriate to the

territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States District Court for the Middle District of Florida, and provide the Commission and the Court a written description of the funds and assets so repatriated.

## X.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## XI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may

hereby be entered, or to entertain any suitable application or motion by the Commission for

additional relief within the jurisdiction of this Court.

Respectfully Submitted,

Randall J. Fons
Regional Director

By: _____

Glenn A. Harris
Senior Trial Counsel
Florida Bar No. 357588
Direct Dial:  (305) 982-6341

Chedly C. Dumornay
Chief, Branch of Enforcement #3
Florida Bar No. 957666

J. Cindy Eson
Senior Counsel
Florida Bar No. 959847

Dated:  May 12, 1999

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
1401 Brickell Avenue, Suite 200
Miami, Florida  33131
Telephone: (305) 536-4700
Facsimile: (305) 536-7465