# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

    Plaintiff,

v.                        CASE NO. 8:20-cv-1120-T-30TGW

TURBO GLOBAL PARTNERS, INC.,
and ROBERT W. SINGERMAN,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came on to be heard upon the Plaintiff's Motion and Memorandum of Law in Support of Civil Monetary Penalties (Doc. 20) and the Defendants' Motion and Memorandum in Support [of] Waiving Civil Monetary Penalties (Doc. 23).

The United States Securities and Exchange Commission (SEC) alleges that the defendants falsely stated in press releases that defendant Turbo Global Partners, Inc. (Turbo) was a distributor of no-contact thermal scanning devices that scan large crowds to detect individuals with elevated fevers, thereby assisting in breaking "the chain of [COVID-19] virus transmission through early identification of ... one of the key early signs of COVID-19" (Doc. 1, p. 2, ¶2). The SEC alleges that the defendants' false

and misleading material statements in the press releases defrauded purchasers of securities in violation of Section 10(b) and Rule 10b-5 of the Exchange Act. 15 U.S.C. 78j(b); 17 C.F.R. 240.10b-5. As part of a consent judgment, the defendants are to be assessed civil monetary penalties. Determination of the amount of the civil penalties was referred to me.

For the foregoing reasons, I recommend that a civil penalty be assessed against defendant Singerman in the amount of $150,000, and against defendant Turbo for $700,000.

## I.

The consent judgments set forth the criteria under which these civil penalties are to be assessed (Docs. 16, 17, p. 3):

> Defendant shall pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Court shall determine the amount of the civil penalty upon motion of the Commission. In connection with the Commission's motion for civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn

> deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for civil penalties, the parties may take discovery, including discovery from the appropriate non-parties.

The defendants do not acknowledge these stipulations. However, as indicated, the consent judgments clearly provide that the complaint allegations will be deemed true for the purposes of determining a civil penalty, and the defendants, having foregone the opportunity to go to trial, are bound by the stipulations they made in settling this case.

The Supreme Court has confirmed the principle that parties are not permitted to deny the truth of stipulated facts. <u>Christian Legal Society Chapter of the University of California, Hastings College of the Law</u> v. <u>Martinez</u>, 561 U.S. 661, 677-78 (2010) ("factual stipulations are formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact"). Accordingly, the assessments of civil penalties are to be decided based upon the facts alleged in the complaint, which are summarized below.

## II.

Turbo, a penny stock company traded on the Over the Counter (OTC) market, is purportedly a marketing company that places digital displays inside retail businesses (Doc. 1, ¶8).[1] Robert W. Singerman is Turbo's chairman and CEO, and largest shareholder (id., ¶9; Doc. 20-6, ℙ6). Singerman owns more than two hundred million shares of Turbo (see Doc. 20-6, ℙ6).

In March 2020, the defendants turned their attention to no-contact thermal scanning devices that were being sold by BeMotion, Inc. (see Doc. 20-2, ¶¶8–10). Turbo issued press releases on March 30, 2020, and April 3, 2020, containing materially false and misleading statements related to these thermal scanning devices (Doc. 1, ¶¶18, 19, 28). Publication of the press releases corresponded with a time of heightened concern about COVID-19 in the United States.

In the first press release, Turbo stated falsely that it had a "strategic alliance" with BeMotion to sell the thermal scanning devices, and characterized itself as "the lead intermediary" and the "U.S. Coordinating

---

[1]Turbo had an agreement with BeMotion, Inc., to purchase digital vending machines from BeMotion, but Turbo did not purchase any machines (Doc. 20-2, ¶1).

agent and Intermediary" for BeMotion's thermal scanning device (id., ¶¶2, 21). This statement was false because BeMotion had not entered into any agreement or alliance with Turbo to sell this device (id., ¶¶16, 22). To the contrary, Hussein Abu Hassan, Founder and Executive Chairman of BeMotion, rejected Singerman's request to make Turbo an exclusive distributor of the device (id., ¶¶15; Doc. 20-2, ¶¶1–2, 10). Additionally, Hassan told Singerman that Turbo could be a distributor only if it had customers to buy the device, which Turbo did not (Doc. 20-2, ¶10).

> Furthermore, the press release falsely stated that:
>
> BeMotion is [the] front facing Partner in the multi-national public-private partnership (PPP) for this [thermal scanning] innovation which[,] simply stated, is **the only scanning technology on the planet with non-contact intelligent human temperature screening and facial recognition.**

(id., ¶19) (emphasis in original). This statement is false in all aspects. BeMotion was not part of a "multi-national public-private partnership," as it was not in partnership with any government entity, nor did BeMotion represent that it was (id., ¶20). Additionally, the press release misrepresented the capability of the thermal scanning technology; Singerman stated that BeMotion's device had facial recognition, when it only had facial detection (id.). In other words, the device could distinguish

5

a face from an object (e.g., coffee), but it could not distinguish between faces (id.), which is critical to identifying those individuals with elevated fevers in a crowd of people.

Moreover, the March 30 release falsely quoted BeMotion's executive chairman as stating:

> Our technology instantly RED FLAGS an elevated body temperature and is 99.99% accurate, and is the only system that includes both state-of-the-art human body temperature and facial recognition....

(id., ¶23) (emphasis in original). BeMotion did not make or authorize this statement (id., ¶24). Also, as indicated, BeMotion's device did not have facial recognition, nor was it the only available thermal scanning system with face detection (id.). Furthermore, Turbo's statement that it was "our technology" falsely indicates that Turbo had an ownership interest in the technology (id., ¶29).

Finally, the March 30 press release falsely attributed the following quote to BeMotion's executive chairman:

> TURBO and BeMotion, through our PPP are ready to deploy and help coordinate any expedited procurement process. After receipt of orders, systems ship in 5-days thereafter. ***This technology is designed to be deployed IMMEDIATELY in each State, with coordinated participation of Local, County, State and Federal

6

> Agencies working together to break the chain of virus transmission with early elevated fever detection.

(id., ¶¶25, 26) (emphasis in original). Singerman, in particular, knew that expedited delivery was not possible. Thus, BeMotion told Singerman that "BeMotion could not presently ship the systems that quickly because [the devices originate from China and BeMotion] did not have the systems in Canada" (id., ¶26).

On April 3, 2020, Turbo issued another press release containing false and misleading material information (id., ¶28). It stated that Turbo had "confirmed" that the "Governor's offices for all 50 states and their Chiefs of Staff had been contacted regarding the availability of BeMotion's equipment," and that CEOs for major retail companies, such as WalMart, were informed that Turbo was "standing by to assist with expedited procurement" (id.). These statements were intentionally misleading because Turbo's "contact" with the government offices and major retailers merely consisted of unsolicited emails or faxes with false information (id., ¶29). Furthermore, as discussed above, "expedited" procurement was not possible.

Turbo's intentionally false and misleading statements materially affected the trading market for its stock (id., ¶30). Specifically,

in the days before the March 30, 2020, press release "trading volume averaged around 31.9 million per day, and the share price ranged from between $0.0016 and $0.0059" (id.). However, on "the first trading day after the March 30 [press] release, [Turbo's] trading volume jumped to 77.8 million shares and the share price hit an intraday high of $0.0068, before closing at $0.0044" (id.). Additionally, after the April 3 press release Turbo's trading "volume reached 76 million shares, and the price hit an intra-day high of $0.0194, before closing at $0.0154" (id., ¶31). These pronounced changes caught the attention of the SEC, which temporarily suspended trading in Turbo securities from April 9, 2020 to April 23, 2020 (id., ¶8).

In May 2020, the SEC filed a complaint against Turbo and Singerman, alleging that the defendants' false and misleading press releases "operate[d] as a fraud and deceit upon the purchasers of [Turbo] securities," in violation of Section 10(b) and Rule 10b-5 of the Exchange Act (id., p. 10). The plaintiff further alleged that the defendants acted with scienter, i.e., an "intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth" (id., pp. 10–11). The plaintiff sought, among other forms of relief, an order assessing civil penalties against each defendant

pursuant to 15 U.S.C. 78u(d)(3) (id., p. 12).

The defendants consented to the entry of judgment (Docs. 14, 15). The judgments permanently restrain the defendants from committing additional violations of federal securities laws, and impose upon them civil penalties, in an amount to be determined by the court (Docs. 16, 17).

The SEC has filed a Motion and Memorandum in Support of Civil Monetary Penalties, which was referred to me (Docs. 20, 21). In response, Singerman filed, purportedly on behalf of both defendants, a "Motion and Memorandum in Support [of] Waiving Civil Monetary Penalties" (Doc. 23). Singerman contends that neither he nor Turbo is financially able to pay a penalty because he purportedly lives on social security income and Turbo has had annual losses since 2016 (id., pp. 6–7). Singerman argues further that "no securities laws were violated" in this matter, and that he and Turbo are "victims of unconscionable business interference" (id., p. 7; see also Doc. 23-1). Moreover, Singerman intends to continue operating Turbo, asserting that Turbo has many joint ventures and that he is "committed to … press on … [and] creat[e] on-going shareholder value" (Doc. 23, p. 6).

I scheduled the motion for a hearing (Doc. 22). At the hearing, counsel for the SEC were present (see Docs. 26, 27). Singerman, who is proceeding pro se, did not attend the hearing. Turbo has no counsel of record and, therefore, no one appeared on its behalf.

SEC counsel argued at the hearing that a third-tier monetary penalty is warranted due to the egregiousness of the violations, the defendants' failure to accept responsibility for their misconduct, and Singerman's recidivism, as he had previously violated federal securities laws. Moreover, SEC counsel argued that Singerman's plan to continue in business increases the likelihood that he will again violate securities laws absent adequate deterrence.

My focus during the hearing was the defendants' allegations that they lacked the financial ability to pay civil penalties, as this appeared to be the only possible mitigating factor. SEC counsel responded that Singerman's allegations should not be taken at face value. They noted that Singerman failed to respond to the SEC's document request, the purpose of which was to determine Singerman's financial status. Furthermore, SEC counsel presented at the hearing Turbo's Annual Report for 2019, which indicates much greater cash flow than alleged by Singerman (Doc. 28).

Specifically, it states that Turbo had, as of December 31, 2019, total assets of $11 million, and that it received in 2019 a $5 million debt settlement (id., pp. F1, F2, F3). The SEC argues that, at least, this information makes questionable the defendants' claim that they are impecunious.

III.

Civil penalties are designed to punish the wrongdoer and to deter future violations. <u>Securities and Exchange Commission</u> v. <u>Monterosso</u>, 756 F.3d 1326, 1338 (11th Cir. 2014). They are to be determined in light of the facts and circumstances of each case. 15 U.S.C. 78u(d)(3)(B)(i).

Civil penalties are divided into a three-tier structure in the Securities Exchange Act, with the penalties being capped by a specified statutory amount. 15 U.S.C. 78u(d)(3)(B). The three tiers have increasing maximum statutory caps.

The first tier applies simply to statutory violations. The second tier requires a violation involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

The penalty sought by the plaintiff falls in the third tier, which, as adjusted for inflation, allows for a penalty (as of January 15, 2020), not to

exceed $192,768 per violation by a natural person, and $963,837 for any other person (see Doc. 20-1). This tier applies if:

> (aa) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. 78u(d)(3)(B)(iii).

The complaint, the allegations of which are accepted as true for the purposes of this motion, establishes that the defendants disseminated to the public on March 30 and April 3, 2020, press releases they knew contained materially false and misleading information, in violation of the Securities Exchange Act.

Furthermore, the defendants' scheme to artificially inflate Turbo share prices so that Singerman could sell his stock at a large profit created a significant risk of substantial losses to other persons. 15 U.S.C. 78u(d)(3)(B)(iii)(bb); Securities and Exchange Commission v. Aragon Capital Management, LLC, 672 F.Supp.2d 421, 451 (S.D.N.Y. Nov. 24, 2009) (An investor need not actually experience any loss in order for a court to consider imposing third-tier penalties.). Thus, investors purchasing Turbo

stock at artificially inflated prices would ultimately be left with virtually worthless shares when it became apparent that the material statements in those press releases were false. See Securities and Exchange Commission v. Monterosso, supra, 756 F.3d at 1338 (The fraudulent scheme created a substantial risk of loss as the revenue overstatements would have been important to any reasonable shareholder.). Furthermore, the plaintiff reasonably argues that, but for its prompt suspension of Turbo trading, these unsuspecting investors would have sustained substantial losses (Doc. 20, p. 7). Therefore, the prerequisites for assessing third-tier penalties have been satisfied. See 15 U.S.C. 78u(d)(3)(B)(iii).

Penalties within the third tier range from $96,385 to $192,768 for a person, and between $481,921 to $963,837 for an entity (Doc. 20-1, p. 3). In determining the amount of the third-tier penalty, or if the penalty should be reduced or not imposed at all, the court considers factors such as:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future

financial condition.

Securities and Exchange Commission v. Aerokinetic Energy Corp., No.
8:08-cv-1409-T-27TGW, 2010 WL 5174509 at *5 (M.D. Fla. Dec. 15, 2010)
(quotation omitted), aff'd, 444 Fed. Appx. 382 (11th Cir. 2011).

As to the first factor, the plaintiff persuasively argues that the
defendants' misconduct was egregious because "the Defendants
aggressively seized an opportunity to exploit the COVID-19 pandemic for
themselves" (Doc. 20, p. 4). Thus, they encouraged investment in Turbo by
falsely purporting to be a distributor of a first-of-its-kind, no-contact thermal
scanning technology, which entities would enthusiastically purchase in order
to detect persons walking into their establishments with elevated fevers, a
COVID-19 symptom (see Doc. 23, p. 2).[2]

Furthermore, the defendants' scienter is established by the
complaint allegations that the defendants "knowingly, intentionally, and/or
recklessly engaged" in this fraudulent scheme (Doc. 1, ¶34; see Doc. 16, p.
3 (allegations of the complaint are accepted as true by the court for the

---

[2]For example, Singerman states (Doc. 23, p. 2):

> The timing [of the thermal scanning technology] hit a
> chord with employers that there might be tools allowing for
> the mass screening of employees as a new-normal
> protective measure as they attempted to return to work.

14

purpose of this motion)).

Additionally, Singerman's misconduct is recurrent, as he was previously prosecuted in 1999 for federal securities violations and consented to entry of judgment in that case (Case No. 99-cv-1117-T-17A; see Doc. 20-3) (1999 case). See Securities and Exchange Commission v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004) (The defendant was a recidivist because, as "the district court recognized, this is not the first time Calvo has violated federal securities laws."). Notably, Singerman's misconduct in this matter also violates the injunction entered in the 1999 securities fraud case.

The court also considers whether the defendant failed to admit wrongdoing. Securities and Exchange Commission v. Aerokinetic Energy Corp., supra, 2010 WL 5174509 at *5. Although Singerman consented to entry of judgment, he now disavows responsibility for his misconduct. Thus, he asserts that "no securities laws were violated" in this case and that the defendants "are the victims of unconscionable business interference" (Doc. 23, p. 7).

A particularly illustrative example of Singerman's repudiation of responsibility are his baseless assertions that the defendants

> [did] not ... attempt to profiteer or otherwise act
> improperly. We just happened to be the first

> company that shared a technology for which we
> held documentary evidence of being a
> 'Distributor' for the U.S. for non-contact mass
> temperature screening.

Id., p. 2. Singerman also recently disavowed any wrongdoing in the 1999

case (Doc. 20-6, ¶¶4, 8, 9, 12).

Moreover, Singerman has been uncooperative and dishonest

with authorities. He failed to respond to the SEC's requests for documents

related to his financial status, despite agreeing in the consent judgment to

participate in discovery related to this motion (see Doc. 16, p. 3).

Furthermore, Singerman lied to SEC attorney Robert Schröeder that he paid

court-ordered disgorgement of $78,000 in the 1999 case, when Singerman

had only remitted $2,075 of that amount (Doc. 20-6, ¶¶8–9, 11–12). As the

SEC argues, these considerations underscore Singerman's disregard for the

law and judicial process.

As to the amount of the penalty, the SEC argues for a third-tier

penalty, without specifying an amount within that tier (Doc. 20, p. 8). After

considering the complaint, the consent judgments, the parties' motions and

the exhibits thereto, I recommend that the court assess a penalty of $150,000

against Singerman, and $700,000 against Turbo. These amounts are greater

than the minimum third-tier penalty in recognition of the egregiousness of

the defendants' scheme to capitalize on the fear created by the COVID-19 pandemic, and Singerman's failure to accept responsibility for his wrongdoing. Furthermore, a substantial penalty is warranted to deter future securities violations, especially considering that Singerman expects Turbo to continue in business. On the other hand, the maximum third-tier penalty is not warranted because the SEC interceded before the public sustained substantial losses due to the defendants' misconduct.

The final consideration is "whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition." <u>Securities and Exchange Commission</u> v. <u>Aerokinetic Energy Corp.</u>, <u>supra</u>, 2010 WL 5174509 at *5. Notably, the Eleventh Circuit has held that, "[a]t most, ability to pay is one factor to be considered in imposing a penalty." <u>Securities and Exchange Commission</u> v. <u>Warren</u>, 534 F.3d 1368, 1370 (11th Cir. 2008); <u>see also</u> <u>Securities and Exchange Commission</u> v. <u>Monterosso</u>, <u>supra</u>, 756 F.3d at 1338. It explained:

> [N]othing in the securities laws expressly prohibits a court from imposing penalties ... in excess of a violator's ability to pay.... [W]ith respect to penalties, the Commission need only make "a proper showing" that a violation has occurred and a penalty is warranted. 15 U.S.C. §§ 77t(d) (1933

> Act); 78u(d)(3) (1934 Exchange Act). Moreover, [the defendant] cites no decisional law stating that the securities laws impliedly prohibit a district court from imposing penalties ... in excess of a violator's ability to pay, and we have located none.

Securities and Exchange Commission v. Warren, supra, 534 F.3d at 1370. It is the defendant's burden to demonstrate a financial condition that warrants a reduction. Securities and Exchange Commission v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993) (discussing in the disgorgement context that the defendant must prove inability to pay by a preponderance of the evidence); see also Securities and Exchange Commission v. Aerokinetic Energy Corp., supra.

The defendants have not met their burden to show that they lack the financial means to pay a penalty. In fact, Turbo may not even assert this argument because Turbo is not represented by counsel, and Singerman is not an attorney. See Local Rule 2.03(e) ("A corporation may appear and be heard only through counsel admitted to practice in the Court ...").

Furthermore, Singerman failed to present evidence that a penalty reduction is warranted. He relies upon his unsworn statements that he has not "receive[d] a pay check since June 2016," and that his "family pool of SSI benefits helps ... meet the burdens of our household and care-

18

giving expenses [for elderly family members] while generating just enough funds to pay for [their] rental home" (Doc. 23, pp. 6, 7). Singerman's self-serving, vague statements are unsworn, unverified, and lack any specification of his assets and debts.[3] Therefore, they are patently insufficient. See Securities and Exchange Commission v. Huffman, supra, 996 F.2d at 803 (The court many reject unsubstantiated, self-serving testimony of a defendant's financial status.). Singerman also did not attempt to substantiate any financial inability by appearing at the hearing to elaborate on his financial condition.

The SEC responded at the hearing that it does not have a clear view of the defendants' financial condition because Singerman failed to respond to its request to produce financial documents. On the other hand, SEC counsel emphasized that Turbo's Financial Disclosure Statement for the period ending December 31, 2019, indicates a much greater cash flow than Singerman stated in his motion (Doc. 28).

SEC counsel particularly focused on the $5 million "gain from settlement of debt" in 2019 (id., p. F2). According to the Notes

---

[3]Singerman also states that he has not filed income tax returns for 2018 or 2019 (Doc. 23, p. 6).

accompanying Turbo's Financial Statement, Turbo has a balance of only $100 as of December 31, 2019, and there is no meaningful explanation of how the $5 million dollars was spent (assuming that the Financial Statement was truthful) (see id., p. F6). In sum, the defendants have not presented evidence that their financial condition warrants a penalty reduction, and especially considering Turbo's Financial Statement, it cannot be said that the defendants are unable to pay a penalty.

Furthermore, the SEC persuasively argues that, in all events, the defendants' purported inability to pay does not merit significant weight in comparison to the other equities, which strongly favor the assessment of a substantial penalty (see supra, pp. 12–17). See Securities and Exchange Commission v. Warren, supra, 534 F.3d at 1370 (The defendant's argument that civil penalties should not be imposed "because he cannot pay a judgment sorely misses the mark."). I therefore recommend no reduction in the civil penalties based on the defendants' purported inability to pay.

## V.

For the foregoing reasons, I recommend that the court assess a civil monetary penalty of $150,000 against defendant Singerman, and $700,000 against defendant Turbo.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: DECEMBER 9 , 2020.

## NOTICE TO PARTIES

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. 636(b)(1)(C). Under 28 U.S.C. 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions.